SHASHANK UPADHYE (*Pro Hac Vice* Motion to be filed)
JOSEPH E. CWIK (*Pro Hac Vice* Motion to be filed)
SAMUEL J. RUGGIO (*Pro Hac Vice* Motion to be filed)
YIXIN H. TANG (*Pro Hac Vice* Motion to be filed)
Email: chenpatents@amintalati.com
AMIN TALATI UPADHYE, LLP
100 S. Wacker Dr., Suite 2000
Chicago, IL 60606
Tel: (312) 466-1033

GREGORY A. ELLIS (State Bar No. 204478)
gellis@scheperkim.com
MICHAEL L. LAVETTER (State Bar No. 224423)
mlavetter@scheperkim.com
SCHEPER KIM & HARRIS LLP
601 W. Fifth St., 12th Fl.
Los Angeles, CA 90071-2025
Tel: (213) 613-4655
Fax: (213) 613-4656

*Attorneys for Plaintiff*
*DEGUI CHEN, Ph.D.*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| DEGUI CHEN, Ph.D., an individual,<br><br>Plaintiff,<br><br>v.<br><br>MICHAEL E. JUNG, Ph.D., an individual, CHARLES L. SAWYERS, M.D., an individual, SAMEDY OUK, Ph.D., an individual, CHRISTOPHER TRAN, an individual, and JOHN WONGVIPAT, an individual,<br><br>Defendants. | Case No.<br><br>COMPLAINT FOR CORRECTION OF INVENTORSHIP OF U.S. PATENT NOS. 8,445,507; 8,802,689; 9,388,159; AND 9,987,261 |

Plaintiff, Dr. Degui Chen ("Dr. Chen"), by and through his undersigned attorneys, pursuant to 35 U.S.C. § 256, make this Complaint against Defendants, Dr. Michael Jung ("Dr. Jung"), Dr. Charles L. Sawyers ("Dr. Sawyers"), Dr. Samedy Ouk ("Dr. Ouk"), Mr. Christopher Tran ("Mr. Tran"), and Mr. John Wongvipat ("Mr. Wongvipat") (collectively "Defendants") as follows:

## NATURE OF THE ACTION

1.      This is an action for the correction of inventorship under 35 U.S.C. § 256 with respect to U.S. Patent Nos. 8,445,507 ("the '507 Patent"), 8,802,689 ("the '689 Patent"), 9,388,159 ("the '159 Patent"), and 9,987,261 ("the '261 Patent"). A true and correct copy of the '507, '689, '159, and '261 Patents are attached as Exhibits 1, 2, 3, and 4.

2.      The '507 Patent, titled, "Androgen Receptor Modulator for the Treatment of Prostate Cancer and Androgen Receptor-Associated Diseases," issued on May 21, 2013 from U.S. Patent Application No. 12/294,881 ("the '881 Application"), and lists five co-inventors: Michael E. Jung, Charles L. Sawyers, Samedy Ouk, Chris Tran, and John Wongvipat. On its face, the '507 Patent lists The Regents of the University of California ("the Regents") as the assignee of the '507 Patent.

3.      Plaintiff Dr. Chen is an inventor on the inventions claimed in the '507 Patent. Yet, through omission, inadvertence, and/or error, he was not named as an inventor of the '507 Patent.

4.      The '689 Patent, titled "Androgen Receptor Modulator for the Treatment of Prostate Cancer and Androgen Receptor-Associated Diseases," issued on August 12, 2014 from U.S. Patent Application No. 13/615,085 ("the '085 Application"), and lists five co-inventors: Michael E. Jung, Charles L. Sawyers, Samedy Ouk, Chris Tran, and John Wongvipat. On its face, the '689 Patent lists The Regents as the assignee of the '689 Patent.

1

5.      Plaintiff Dr. Chen is an inventor on the inventions claimed in the '689 Patent. Yet, through omission, inadvertence, and/or error, he was not named as an inventor of the '689 Patent.

6.      The '159 Patent, titled "Substituted Diazaspiroalkanes As Androgen Receptor Modulators," issued on July 12, 2016 from U.S. Patent Application 14/318,234 ("the '234 Application"), and lists five co-inventors: Michael E. Jung, Charles L. Sawyers, Samedy Ouk, Chris Tran, and John Wongvipat.  On its face, the '159 Patent lists the Regents as the assignee of the '159 Patent.

7.      Plaintiff Dr. Chen is an inventor on the inventions claimed in the '159 Patent. Yet, through omission, inadvertence, and/or error, he was not named as an inventor of the '159 Patent.

8.      The '261 Patent, titled "Substituted Diazaspiroalkanes As Androgen Receptor Modulators," issued on June 5, 2018 from U.S. Patent Application 15/181,030 ("the '030 Application"), and lists five co-inventors: Michael E. Jung, Charles L. Sawyers, Samedy Ouk, Chris Tran, and John Wongvipat.  On its face, the '261 Patent lists the Regents as the assignee of the '261 Patent.

9.      Plaintiff Dr. Chen is an inventor on the inventions claimed in the '261 Patent.  Yet, through omission, inadvertence, and/or error, he was not named as an inventor of the '261 Patent.

10.     Dr. Chen is obligated to assign his rights in the '507, '689, '159, and '261 Patents to the Regents via an employment agreement.

11.     Dr. Chen requests that the Court order the Director for Patents of the United States Patent and Trademark Office ("USPTO") to correct the '507, '689, '159, and '261 Patents to add Dr. Chen as a joint inventor and to remove Dr. Jung, Dr. Sawyers, Mr. Tran, and Mr. Wongvipat as inventors.

12.     There is no state forum available to vindicate Dr. Chen's inventorship rights due to the complete preemption of jurisdiction for state courts to hear patent cases.

2

13.     This action calls for the interpretation of federal law under 35 U.S.C. § 116, § 256 and MPEP § 2137.04 - .05.

## THE PARTIES

14.     Plaintiff Dr. Degui Chen ("Dr. Chen") is a former Assistant Professor of Medicine at UCLA and an individual and resident of the People's Republic of China residing in Shanghai, China.

15.     Dr. Jung is a citizen and resident of the State of California. He is the first named inventor on the '507, '689, '159, and '261 Patents.  On information and belief, Dr. Jung has no ownership interest in the patents but does have an economic stake in the patents' validity via his agreements with the University of California ("the University").

16.     Dr. Sawyers is a citizen and resident of the State of New York. He is a named inventor on the '507, '689, '159, and '261 Patents.  On information and belief, Dr. Sawyers has no ownership interest in the patents but does have an economic stake in the patents' validity via his agreements with the University of California.

17.     Dr. Ouk is a citizen and resident of the State of California.  He is a named inventor on the '507, '689, '159, and '261 Patents.  On information and belief, Dr. Ouk has no ownership interest in the patents but does have an economic stake in the patents' validity via his agreements with the University of California.

18.     Mr. Tran is a citizen and resident of the State of California.  He is a named inventor on the '507, '689, '159, and '261 Patents.  On information and belief, Mr. Tran has no ownership interest in the patents but does have an economic stake in the patents' validity via his agreements with the University of California.

19.     Mr. Wongvipat is a citizen and resident of the State of New York.  He is a named inventor on the '507, '689, '159, and '261 Patents.  On information and belief, Mr. Wongvipat has no ownership interest in the patents but does have an

economic stake in the patents' validity via his agreements with the University of California.

20.     Dr. Jung, Dr. Sawyers, Dr. Ouk, Mr. Tran, Mr. Wongvipat and Dr. Chen all have an economic interest in who is listed as a joint inventor because upon information and belief all properly named joint inventors share a part of the royalties and fees received by the University with respect to the '507, '689, '159, and '261 Patents.

## JURISDICTION AND VENUE

21.     This action is brought under the patent laws of the United States, 35 U.S.C. § 101 *et seq.*, and in particular, 35 U.S.C. § 256.  This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 1338.

22.     Personal jurisdiction and venue are proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) because for purposes of personal jurisdiction and venue, a substantial part of the events or omissions giving rise to the claims occurred in this Judicial District.  In addition, venue of this action is properly found in this Judicial District pursuant to 28 U.S.C. § 1391(b) and (c) because the Defendants are subject to personal jurisdiction in this Judicial District.

## FACTUAL BACKGROUND

### The Subject Matter Claimed by the Patents-In-Suit

23.     The patents-in-suit cover a series of chemical compounds that have been coined the "A" series compounds.

24.     The '507 patent discloses only two A series compounds synthesized at the University of California, Los Angeles ("UCLA"): A51 (top) and A52 (bottom). (Ex. 1 ('507 Patent) at Col. 30, ll. 43-60, claim 1).

4

25.     The structures of an A series compound can be broken down into three distinct parts: a nitrogen-containing substituted ring on the left-hand side (as drawn in the diagrams in the patents-in-suit), a center thiohydantoin ring, and a right-hand substituted aryl ring.  These compounds are scientifically referred to as pyridine-substituted imidazolidines.

26.     At the start of his employment at UCLA, Dr. Chen signed an employment agreement.  The agreement stated that Dr. Chen must assign all of the rights to his inventions that he conceived of during the tenure of his position to The Regents.  In return, Dr. Chen would receive an "inventor share."

27.     Dr. Chen has a financial interest in being named an inventor because as an inventor or joint inventor, he is entitled to an "inventor share" of the royalties and fees received by the Regents with respect to the '507, '689, '159, and '261 Patents.   Dr. Chen's professional reputation also will be benefited by being named as an inventor to the '507, '689, 159, and '261 Patents.

28.     Upon information and belief, the Regents are receiving, have received and/or will receive royalties and fees with respect to the '507, '689, '159, and '261 Patents.

5

**The Development of Androgen Receptor Antagonists at UCLA**

29.     Over the course of Dr. Chen's tenure at UCLA, the Regents obtained a number of patents based on his multiple inventions.

30.     For example, The Regents are facially listed as the assignee for the following patents: U.S. Patent Nos. 7,709,517 ("the '517 Patent"), 7,718,684 ("the '684 Patent"), 8,034,548 ("the '548 Patent"), 8,183,274 ("the '274 Patent"), and 9,126,941 ("the '941 Patent").  (Ex. 5 (excerpts)).  Dr. Chen is a named inventor on all of the above-mentioned patents and receives royalties on the patents that generate monetary value via commercialization and/or licensing.

31.     Four of the patents, the '517, '684, '274, and '941 patents (collectively, "the RD patents"), are directed to a class of compounds referred to with an "RD" prefix.  The covered compounds were modified (somewhat slightly and somewhat heavily) from a scaffold originally developed by a French Pharmaceutical Company Roussel Uclaf ("RU") and published in a 1994 scientific journal article.

32.     Dr. Chen gave the name "RD" – it stands for "Rational Design."

33.     The compounds covered by the RD patents were developed as therapeutic agents for the treatment of prostate cancer.  In recognition of the significant value of these compounds, these patents were licensed to Medivation, Inc. in 2005.  One of the compounds, RD 162', was developed into a drug called Xtandi®.  The FDA approved Xtandi® in 2012 as an androgen receptor ("AR") inhibitor indicated for the treatment of patients with metastatic castration-resistant prostate cancer.  (Ex. 6).

34.     The chemical structure for Xtandi® is:



6

(U.S. Patent No. 7,709,517 at Col. 115, ll. 36-45).

35.   Plaintiff Dr. Chen is a molecular biologist and biochemist.  He was trained at the Cold Springs Harbor Laboratory from 1995 to 1998.  In 1998, he received his Ph.D. in molecular biology and biochemistry.

36.   Dr. Chen began his work at UCLA, School of Medicine, Department of Hematology and Oncology, in 1999 as a postdoctoral research fellow, where his work included studying the reasons for prostate cancer drug resistance.

37.   From 1999 to 2003, Dr. Chen worked with a graduate student named Derek Welsbie. Together they discovered that the aberrant activity of the androgen receptor was the underlying reason for prostate cancer drug resistance.

38.   This discovery was published in Nature Medicine in January of 2004 and Dr. Chen is the first named author of the article. (Ex. 7).

39.   On February 1, 2003, Dr. Chen received a faculty appointment to an Assistant Professor of Medicine at UCLA. (Ex. 8).

40.   Dr. Chen received a nomination for the Chancellor's Award for Postdoctoral Research for Exceptional Accomplishments in Research, in 2003. (Ex. 9).

41.   While at UCLA, Dr. Chen started a Prostate Cancer Project with his colleagues.  He acted as the leader of the project, and developed chemical compounds and methods for testing these compounds.  He named the project "Rational Design."

42.   In late 2002, Dr. Chen contacted Dr. Jung regarding the already four-year strong Prostate Cancer Project specifically to start synthesizing potential compounds to be tested in Dr. Chen's innovative biological assays.

43.   Dr. Samedy Ouk, a postdoctoral research fellow working in Dr. Jung's laboratory came aboard the project, and was the one responsible for the synthesis of the compounds and for maintaining the list of all compounds synthesized.

44.     Dr. Ouk synthesized over 160 different compounds, including compounds with different structural cores.  Upon information and belief, Dr. Ouk simply assigned the next "RD" number to the compounds he synthesized for the Prostate Cancer Project.  However, upon information and belief the A series compounds were not assigned an "RD" number.

45.     Effective from January 4, 2004, Dr. Chen received a grant for the project titled "Role of Nuclear Receptor Cofactors in Hormone Refractory Prostate Cancer.".  The grant stated "Principal Investigator: C659 CHEN, CHARLIE."  The grant amount was for $343,125.00.  (Ex. 10).

46.     RD-numbered compounds were synthesized and tested by *in vitro* and *in vivo* assays starting in late 2003 and continuing into 2004 and 2005.

47.     On August 31, 2004, a meeting was held in Dr. Jung's office and included the following individuals: Dr. Chen, Dr. Ouk, Dr. Jung, and Dr. Sawyers.

48.     Mr. Tran was not present at this meeting.

49.     Mr. Wongvipat was not present at this meeting.

50.     At this meeting, multiple alternative molecules and modifications were discussed due to a perceived patentability problem with their current candidate structure.

51.     Throughout 2004, Dr. Chen (the molecular biologist and biochemist designing and testing any newly synthesized compound) and Dr. Ouk (the synthetic organic chemist synthesizing compounds) frequently met and discussed the status of their research.

52.     They would discuss the project and would propose potential compounds for Dr. Ouk to synthesize and Dr. Chen to test.

53.     One such meeting occurred in early October between Dr. Ouk and Dr. Chen at a lunch area at UCLA called the "bomb shelter."

54.     At this meeting, Dr. Chen and Dr. Ouk jointly proposed making a pyridine analog of RD37, which would later be called A51.

8

55.     On October 13, 2004, consistent with the collaboration, and upon Dr. Chen's recommendation, Dr. Samedy Ouk emailed Dr. Chen to purchase a critical ingredient. (Ex. 11). This ingredient, 3-(trifluoromethyl)pyridine, was used by Dr. Ouk to synthesize the proposed compound. In fact, the '507 Patent expressly describes the synthesis of the claimed compounds; it states "… a mixture of 3-(trifluoromethyl)pyridine (1.476g, 10 mmol) and methyltrioxorhenium…." (Ex. 1 at Col. 11, ll. 26-27).

56.     Upon receiving the ingredient from Dr. Chen, Dr. Ouk immediately began synthesizing the first compound embodying the subject matter claimed by the patents-in-suit, A51.  At this time, he did not give it a name.

57.     A51 was based on the structure of RD37:



(**A51**, Ex. 1, at col. 30, ll. 43-51);          (**RD37**, '941 patent, at col. 89, ll. 15-25).

58.     There is one structural difference between the two compounds depicted above.  RD37, on the right, contains a full six member carbon *left* ring—an "aryl" ring or a benzene ring.  A51, on the left, contains a six member ring with a nitrogen substitution located at the top of the *left* ring—or a "heterocyclic" ring (specifically, a pyridine ring).

59.     By January, 2005, Dr. Ouk had finished his synthesis of A51.

60.     On January 23, 2005, Dr. Ouk confirmed the identity of A51 through the use of an analytical chemistry technique called nuclear magnetic resonance spectroscopy ("NMR"). (Ex. 12).  Dr. Ouk drew a chemical structure on a printout of the NMR result, which shows the structure of A51 (but still unnamed at that time).

9

61.     Dr. Ouk brought the newly synthesized A51 compound in an unlabeled vial to Dr. Chen to run his biological testing assays on, along with the NMR spectrum printout with the hand-drawn chemical structure of A51 on it.  Dr. Chen made a scanned copy of the NMR spectrum printout.

62.     On or before February 15, 2005, Dr. Chen tested A51 using three of the *in vitro* bioactivity assays he developed for the Prostate Cancer Project.  (Ex. 13; Ex. 14).

63.     Because the compound was not named by Dr. Ouk, Dr. Chen indicated the test results from the compound as "CC1" on the electronic test data.

64.     After Dr. Chen obtained his test results on A51, Dr. Ouk and Dr. Chen met to discuss Dr. Chen's testing results.  Dr. Chen told Dr. Ouk that the pyridine analog worked.  It was as good as RD37.

65.     Upon information and belief, no further work was done on any A series compounds (pyridine-substituted imidazolidines) or on any compound embodying the subject matter claimed by the patents-in-suit—by anyone—until October, 2005.

66.     Upon information and belief, in the Spring of 2005, a company called Medivation was discussing potentially licensing some of the compounds from the Prostate Cancer Project with the UCLA Office of Intellectual Property ("OIP") personnel, Dr. Claire Wake and Ms. Emily Loughran.

67.     On June 22, 2005, Dr. David Hung of Medivation sent an email only to Dr. Ouk with the subject line "hello from Medivation!"  Dr. Hung requested information for RD37 and RD131 compounds.  (Ex. 15).

68.     At that time, Dr. Chen was unaware of the June 22, 2005, communication from Dr. Ouk to Dr. Hung. Dr. Chen was unaware that Dr. Ouk was sending and discussing with David Hung the laboratory data Dr. Chen generated regarding various molecules.

69.     The same day, Dr. Ouk provided an email attachment to Dr. Hung discussing RD37 and RD131 data and experiments that "Charlie did."  By "Charlie," Dr. Ouk was referring to Dr. Chen.

70.     In addition to responding to the inquiry about RD37 and RD131, Dr. Ouk told David Hung that an "original (patentable) scaffold was tested."  He further stated that "[o]nly one compound representing this scaffold was made," and "[t]he design of this molecule was inspired by RD series."  Dr. Ouk stated that "***its activity is encouraging***."  (Ex. 15) (emphasis added).

71.     Upon information and belief, the "original (patentable) scaffold" compound in Dr. Ouk's June 22, 2005 email refers to the still-unnamed A51 compound.

72.     The "original scaffold" compound discussed by Dr. Ouk in June of 2005 is not RD144. RD144 is a pyrazolone scaffold, not a thiohydantoin. However, RD144 had not been tested by June 22, 2005, and no testing results from RD144 existed or could possibly lead to Dr. Ouk stating, "its activity is encouraging."

73.     In July, 2005, Dr. Chen performed *in vitro* tests involving a compound called RD162.

74.     On July 29, 2005, Dr. Jung emailed Dr. Sawyers telling him that RD162 has "great PK and may ultimately be the best of the series."  Dr. Sawyers responded by saying "Charlie [Dr. Chen] told me the same thing about RD-162."  (Ex. 16).

75.     As of the end of July, 2005, Dr. Chen knew that the right-hand structure of RD162 could be combined with a pyridine structure on the left.  Dr. Chen envisioned a combination of the idea of A51 (left-hand side pyridine capable of binding to AR) and RD162 (right-hand side structure that confers AR-antagonist activities and good PK properties).  Once Dr. Chen discovered and knew that RD162 was a compound with good AR-antagonist

11

activity and PK properties, it was natural to take the left-hand pyridine piece and put it with RD162's right-hand side structure.

76.     *In vivo* mouse studies were carried out at UCLA on RD162 in 2005. Dr. Chen was involved in designing and directing the *in vivo* mouse studies, including choosing the formulations to use for the studies.

77.     On September 9, 2005, Dr. Chen resigned his position at UCLA.

78.     Dr. Chen returned the remaining and unused portion of his research grant to the grantor upon his resignation.

79.     As set forth above, Dr. Chen participated in the conception of the invention claimed by the '507, '689, '159, and '261 Patents.

80.     Dr. Jung did not make any contribution to the invention that would warrant listing on any of the '507, '689, '159, and '261 Patents as a joint inventor.

81.     Dr. Sawyers did not make any contribution to the invention that would warrant listing on any of the '507, '689, '159, and '261 Patents as a joint inventor.

82.     Mr. Wongvipat was not involved in the conception of the inventions claimed in the '507, '689, '159, and/or '261 Patents.

83.     Mr. Tran was not involved in the conception of the inventions claimed in the '507, '689, '159, and/or '261 Patents.

84.     On September 24, 2005, Dr. Jung emailed David Hung responding to his email with the subject line "another question."  Dr. Jung stated "the left hand aryl ring has the CN and CF3 groups and cannot be changed without great loss of activity (that's the group responsible for binding)." (Ex. 17)

85.     On September 29, 2005, David Hung emailed Dr. Sawyers and stated he "just had an interesting talk with Samedy regarding Charlie Chen and some data that I discovered in the massive data review I conducted yesterday."  David Hung stated that he does "not want to get involved in any lab politics, so obviously, I am regarding all of this confidential." (Ex. 18)

86.     The same day, Dr. Sawyers responded to David Hung and told him that he "appreciate[s] your independent review of the data, so don't worry about lab politics."  Further, Dr. Sawyers stated it "would be helpful if I could get a copy of all the data you are reviewing to make sure we are on the same page.  Samedy didn't copy me on what he sent you." (*Id.*).

87.     David Hung then followed up with Dr. Sawyers and stated that "[t]here is another issue with RD162 which is a patent one which we found out about yesterday."  He stated that "the other option would be to try another compound which we think looks attractive but is not a patent problem." (*Id.*).

88.     On or before October 27, 2005, Dr. Ouk drafted and electronically signed and dated a letter (October 27, 2005, "First Confession Letter") regarding the already-made A51 and *a proposed compound to be made* by combining the left hand pyridine substituted ring from A51 with the right hand aryl ring structure from RD162.  (Ex. 19).

89.     The structure of the proposed compound was drawn in the First Confession Letter, and it is the structure of A52.  (*Id.*)

90.     The First Confession Letter falsely alleges that Dr. Chen did not reveal the activity of A51 to Dr. Ouk.  (*Id.*).

91.     At the end of this letter, Dr. Ouk stated that "You can discuss with Pr. Jung. He didn't know about A51 yet. This A51 is not the same as the class of the original compound that we just patent." (*Id.*).

92.     On November 5, 2005, Dr. Ouk wrote Dr. Sawyers an email with an attachment labeled "A51 Story.doc" informing him of A51 and proposing A52. (Ex. 20).  This November 5, 2005 version ("Second Confession Letter") does not have a signature or a date.

93.     The Second Confession Letter contains an allegation that was not present in the First Confession Letter: "I believe that Charlie came to my lab when

I was absent and took my NMR spectra concerning A51 preparation (I did not find them any more in my file classifier)." (*Id.*).

94.     Upon information and belief, Dr. Sawyers was not aware of the synthesis of A51 prior to receiving this November 5, 2005, email from Dr. Ouk. (Ex. 20).

95.     Upon information and belief, prior to receiving the Second Confession Letter from Dr. Ouk on November 5, 2005, email, Dr. Sawyers had no knowledge of A51.

96.     Upon information and belief, Dr. Sawyers was not aware of the synthesis of A51 as of November 4, 2005.

97.     Upon information and belief, Dr. Sawyers had no knowledge of A51 as of November 4, 2005.

98.     On November 6, 2005, Dr. Sawyers responded to Dr. Ouk saying "we should test A51 asap in the *in vitro* assay and disclose to Claire so she can claim it with the new filings." (Ex. 21).  Further, Dr. Sawyers stated "I will bring this up with Mike Jung, but it should probably come from you first. Thanks for letting me know." (*Id.*).

99.     The same day, Dr. Ouk responded to Dr. Sawyers' email stating "I feel relief to speak this out [sic]."  Dr. Ouk further stated that "I also **have the proof of NMR recorded with date and time** which could be used in case of litigation." Dr. Ouk ended the email with "I will e-mail Prof Jung to let him know about the existing of A51 [sic]."  (*Id.*) (emphasis added).

100.   Upon information and belief, Dr. Jung was not aware of the synthesis of A51 as of November 6, 2005.

101.   Upon information and belief, Dr. Jung had no knowledge of A51 as of November 6, 2005.

102.   On November 14, 2005, Dr. Jung emailed Dr. Ouk and informed him that he made several "minor corrections to your letter and want to show them to

14

you." (Ex. 22).  Dr. Jung further stated that he wanted "very much to learn about the activity of A51 and A52." (*Id.*).

103.   A version of the "confession letter" dated November 15, 2005 ("Signed Confession Letter") was printed on a UCLA letterhead and signed by Dr. Ouk. (Ex. 23).

104.   The signed version of the letter includes a conception story regarding A51 involving the August 31, 2004 meeting and alleges that Dr. Ouk suggested at that meeting the idea of "replacing the first aryl ring [of unspecified compounds] with a heterocyclic ring," which may encompass a pyridine substitution that could result in the A-series compounds among many other things.  (Ex. 23).  These statements and allegations were not in the first or second versions of the "confession letter." (Ex. 19; Ex. 20).

105.   This Signed Confession Letter alleges that Dr. Ouk had "more evidence to prove the bad intention of Dr. Chen; namely the unusual chemical order, the RD54 data, and the loss of the A51 spectra." (Ex. 23).  Dr. Ouk wrote in the Signed Confession Letter that he discovered that the NMR spectrum for A51 was missing on October 17, 2005, which was before he drafted the First Confession Letter.  (*Id.*).

106.   In the Signed Confession Letter, the structure of the pyridine-containing A52 was removed and a generic structure for substituted benzene-thiohydantoin-benzene compounds was included, along with a description of the patent applications covering this "general structure." (*Id.*).  The generic structure was labeled "RD series."

107.   The First Confession Letter states "You can discuss with Pr. Jung. He didn't know about A51 yet. This A51 is not the same as the class of the original compound that we just patent." (Ex. 19).  These statements were removed and not present in the Signed Confession Letter.  (Ex. 23)

15

108.   On November 17, 2005, Dr. Sawyers emailed Dr. Jung stating that he "gave Claire a headsup on another potential filing to cover A51 (with an off-the-record warning about Charlie), pending data from Chris."  (Ex. 24).

109.   Upon information and belief, Dr. Ouk finished synthesis of A51 for the second time, and A52 for the first time, in November or December of 2005.

110.   Upon information and belief, after finishing the synthesis in November or December of 2005, Dr. Ouk gave the compounds to Mr. Tran and/or Mr. Wongvipat for testing. Mr. Tran and Mr. Wongvipat's work on A51/A52 was done at the direction and under the supervision of Dr. Ouk.

111.   Upon information and belief, Mr. Tran and Mr. Wongvipat had no knowledge of A51 or A52's existence prior to receiving the compounds for testing.

112.   Mr. Tran and Mr. Wongvipat did not have any involvement in the conception of the structures of the A series compounds, the inclusion of these compounds in pharmaceutical compositions, or the use of these compounds in the treatment of any disease.

113.   Mr. Tran and Mr. Wongvipat did not make any inventive contribution toward any pharmaceutical composition involving any A series compounds, or the use in treatment of any disease by any A series compounds.

114.   Mr. Tran and Mr. Wongvipat's work on A51/A52 was not an independent conceptual contribution to the claimed invention, but rather, was routine laboratory testing done at the direction of one or more true inventors based on previously established and well known pharmaceutical compositions and testing methods.

115.   On or before December 15, 2005, Dr. Jung began drafting a "new Invention Report" for A51 and A52.  (Ex. 25).  He emailed Dr. Ouk on December 15, 2005, and asked him "[w]hat are the structures of A51 and A52 and their activities (for the new Invention Report)."  (*Id.*).  He also asked Dr. Ouk to "leave

16

me electronically their syntheses and biodata" and to "[p]lease get back to me quickly." (*Id.*).

116.   Dr. Jung did not ask Mr. Tran or Mr. Wongvipat for "biodata" on A51 and A52.

117.   On January 5, 2006, Dr. Jung emailed Dr. Ouk asking him about his synthesis of A52.  In particular, Dr. Jung stated that "we may want to make a lot of A52 and your route is very problematic." (Ex. 26).

118.   On March 14, 2006, Dr. Jung emailed Dr. Ouk again with the subject line "Help!!!" (Ex. 27).  Dr. Jung stated "[w]e are having terrible troubles getting your synthesis of A52 to work, both the nitration and the final coupling." (*Id.*). He further asked Dr. Ouk if he "would be willing to come in on a weekend and help us out." (*Id.*).

119.   On March 27, 2006, the first provisional patent application to which the patents-in-suit claim the benefit of, the No. 60/785,978 provisional application, was filed.  (Ex. 1).

120.   The patent office records show that a corrected provisional filing was later filed with the USPTO and included a Rule 1.48 Request for Correction of Inventorship to list "John Wongvipat" and "Chris Tran" as inventors.

121.   On January 13, 2008, Dr. Jung emailed Dr. Ouk and asked him to "rewrite" his November 15, 2005 letter (the Signed Confession Letter or "A51 story") to "include A52 along with A51 at every place where you mention A51" and to change the title to "A51/A52 Invention." (Ex. 28).

122.   Dr. Jung provided text to some of the changes he asked Dr. Ouk to make to the letter, for example by saying "change it to 'I finished the synthesis of my final targets containing a pyridine ring, designated A51 and A52, on XXXXX (find the exact date) (notebook X, page XXX-YYY). I gave these compounds to Dr. Chen for biological testing at this time.'" (*Id.*).

123.   Dr. Jung asked Dr. Ouk to "[p]lease use the same date (11/15/05), sign the revised letter and get it back to me ASAP!"  In fact, Dr. Jung "attached your original letter so you can work from it."  (*Id.*).

124.   Dr. Ouk responded by saying "[a]ctually, Charlie did not test A52.  We made A52 after he left.  A51 is the twin of RD37.  At the time, A51 was designed to compare apple to apple with RD37."  (*Id.*).

125.   Dr. Chen did "compare apple to apple" by testing A51 and comparing the results to RD37.  (Ex. 13; Ex. 14).  Dr. Chen's test results from February, 2005, showed for the first time that the pyridine substitution idea worked for compounds with the benzene-thiohydantoin core structure.

126.   The '507 Patent issued on May 21, 2013.  (Ex. 1).  The '689 Patent issued on August 12, 2014.  (Ex. 2).  The '159 Patent issued on July 12, 2016. (Ex. 3).  The '261 Patent issued on June 5, 2018.  (Ex. 4).

127.   These patents contain incorrect inventorship because Dr. Chen significantly contributed to the conception of one or more inventions claimed in the '507, '689, '159, and '261 Patents and thus is a joint inventor of the inventions claimed in the patents.

128.   Dr. Chen significantly contributed to the invention of the subject matters in all claims of the '507, '689, '159, and '261 Patents.

129.   On February 14, 2018, the FDA issued final approval to Janssen Biotech, Inc.—a wholly owned subsidiary of Johnson & Johnson—to market the claimed subject matter of the '507, '689, '159, and '261 Patents, under the trade name Erleada®.  (*see* https://www.erleada.com/).

130.   The patents-in-suit are listed on the electronic version of the FDA's "Orange Book" in association with Erleada®.

131.   The error in not listing Dr. Chen as a joint inventor of the inventions claimed in the '507, '689, '159, and '261 Patents arose without any deceptive intent on Dr. Chen's part.

1          **Dr. Chen's Previous Attempts to Correct Inventorship**

2          132.   Dr. Chen became aware of the '507 patent issuance in 2013 and

3    attempted to correct the inventorship.

4          133.   In 2013, Dr. Chen retained Attorney Dr. Weisun Rao, from the law

5    firm of Greenberg Traurig LLP, regarding the improper inventorship on the

6    patents-in-suit.  At that time, the '507 patent had already issued, but the other

7    patents-in-suit had not.

8          134.   Dr. Rao sent a letter dated November 11, 2013, to The Regents

9    informing them of the incorrect inventorship.  (Ex. 29).

10         135.   Specifically, the letter stated that "Dr. Ouk and Dr. Chen have both

11   confirmed that they two together conceived the structure of A51 in early October

12   of 2004 on the lunch table at the bomb shelter at UCLA and surmised that, like the

13   compounds of the RD series licensed to Medivation, the compound A51 may be

14   used to treat prostate cancer."  (*Id.*).

15         136.   Further, the letter stated that "On October 13, 2004, Dr. Chen ordered

16   the chemical 2-amino-4-(trifluoromethyl)pyridine specifically for the synthesis of

17   A51 and A52.  On October 18, 2004, Dr. Ouk started the synthesis of A51 and

18   finished the synthesis on January 23, 2005.  Dr Chen tested the compound and

19   obtained the biological activity of the compound on February 15, 2005.   As the

20   compounds A51 and A52, their synthesis and pharmaceutical activities, are the

21   basis and main claims for the '507 Patent, both of Dr. Ouk and Dr. Chen should be

22   the inventors of the patent."  (*Id.*).

23         137.   The letter further stated that "Dr. Ouk and Dr. Chen both have

24   indicated that Dr. Michael Jung did not contribute to the invention of the '507

25   Patent and should be removed from the list of inventors."  Further, "Dr. Michael

26   Jung did not conceive A51 and A52, nor did Dr. Michael Jung design or synthesize

27   A51 and A52 or test their biological activities. Therefore, he should not have been

28   named as an inventor."  (*Id.*).

138.   On information and belief, the Regents did not take any action to correct inventorship upon receiving Dr. Rao's letter.

139.   Dr. Chen then retained the law firm of Amin Talati Upadhye LLP.

140.   On November 8, 2016, counsel from Amin Talati Upadhye LLP mailed a letter with a detailed factual basis demonstrating Dr. Chen's status as an inventor on the first three patents-in-suit.  At that time the '261 patent had not issued.

141.   On information and belief, Amin Talati Upadhye LLP did not receive a response.

142.   On February 10, 2017, counsel from Amin Talati Upadhye LLP mailed a follow up letter.

143.   After a subsequent conference call with The Regents, their in-house and outside counsel, The Regents have not taken any action to correct the error.

144.   Dr. Chen seeks only a determination of inventorship in the '507, '689, '159 and '261 patents.  He does not seek a determination in ownership of the '507, '689, '159 and '261 patents.

145.   Upon information and belief, Dr. Jung does not have an ownership interest in the '507, '689, '159 or '261 patents.

146.   Dr. Jung never contracted with Dr. Chen regarding the subject matter of the '507, '689, '159 or '261 patents.

147.   Upon information and belief, Dr. Sawyers does not have an ownership interest in the '507, '689, '159 or '261 patents.

148.   Dr. Sawyers never contracted with Dr. Chen regarding the subject matter of the '507, '689, '159 or '261 patents.

149.   Upon information and belief, Dr. Ouk does not have an ownership interest in the '507, '689, '159 or '261 patents.

150.   Dr. Ouk never contracted with Dr. Chen regarding the subject matter of the '507, '689, '159 or '261 patents.

151.   Upon information and belief, Mr. Tran does not have an ownership interest in the '507, '689, '159 or '261 patents.

152.   Mr. Tran never contracted with Dr. Chen regarding the subject matter of the '507, '689, '159 or '261 patents.

153.   Upon information and belief, Mr. Wongvipat does not have an ownership interest in the '507, '689, '159 or '261 patents.

154.   Mr. Wongvipat never contracted with Dr. Chen regarding the subject matter of the '507, '689, '159 or '261 patents.

## COUNT I

### (Correction of Inventorship on U.S. Patent 8,445,507
### Pursuant to 35 U.S.C. § 256 As To All Defendants)

155.   The allegations of paragraphs 1 through 154 of this Complaint are repeated, realleged and incorporated herein as if fully set forth in this Count.

156.   Dr. Chen made joint and independent conceptual contributions to the inventions claimed in claims 1-31 of the '507 patent.

157.   Through omission, inadvertence, and/or error, Dr. Chen was not listed on the '507 Patent as an inventor of the inventions claimed in the '507 Patent.

158.   The omission of Dr. Chen as an inventor on the '507 Patent occurred without any deceptive intent on Dr. Chen's part.

159.   Dr. Jung and Dr. Sawyers did not contribute to the conception of the inventions claimed by the '507 Patent.  They should not have been named as inventors and should be removed for misjoinder pursuant to 35 U.S.C. § 256.

160.   Furthermore, Mr. Tran and Mr. Wongvipat were unaware of A51/A52 until more than a year after it was first conceived and nine months after A51 was tested by Dr. Chen.  Their work did not constitute independent or joint conceptual contributions to the inventions claimed by the '507 Patent, and as such, they should be removed for misjoinder pursuant to 35 U.S.C. § 256.

## COUNT II

21

**(Correction of Inventorship on U.S. Patent 8,802,689
Pursuant to 35 U.S.C. § 256 As To All Defendants)**

161.   The allegations of paragraphs 1 through 160 of this Complaint are repeated, realleged and incorporated herein as if fully set forth in this Count.

162.   Dr. Chen made joint and independent conceptual contributions to the inventions claimed in claims 1-19 of the '689 patent.

163.   Through omission, inadvertence, and/or error, Dr. Chen was not listed on the '689 Patent as an inventor of the inventions claimed in the '689 Patent.

164.   The omission of Dr. Chen as an inventor on the '689 patent occurred without any deceptive intent on Dr. Chen's part.

165.   Dr. Jung and Dr. Sawyers did not contribute to the conception of the inventions claimed by the '689 Patent.  They should not have been named as inventors and should be removed for misjoinder pursuant to 35 U.S.C. § 256.

166.   Furthermore, Mr. Tran and Mr. Wongvipat were unaware of A51/A52 until more than a year after it was first conceived and nine months after A51 was tested by Dr. Chen.  Their work did not constitute independent or joint conceptual contributions to the inventions claimed by the '689 Patent, and as such, they should be removed for misjoinder pursuant to 35 U.S.C. § 256.

## <u>COUNT III</u>

**(Correction of Inventorship on U.S. Patent 9,388,159
Pursuant to 35 U.S.C. § 256 As To All Defendants)**

167.   The allegations of paragraphs 1 through 166 of this Complaint are repeated, realleged and incorporated herein as if fully set forth in this Count.

168.   Dr. Chen made joint and independent conceptual contributions to the inventions claimed in claims 1-33 of the '159 patent.

169.   Through omission, inadvertence, and/or error, Dr. Chen was not listed on the '159 Patent as an inventor of the inventions claimed in the '159 Patent.

170. The omission of Dr. Chen as an inventor on the '159 Patent occurred without any deceptive intent on Dr. Chen's part.

171. Dr. Jung and Dr. Sawyers did not contribute to the conception of the inventions claimed by the '159 Patent. They should not have been named as inventors and should be removed for misjoinder pursuant to 35 U.S.C. § 256.

172. Furthermore, Mr. Tran and Mr. Wongvipat were unaware of A51/A52 until more than a year after it was first conceived and nine months after A51 was tested by Dr. Chen. Their work did not constitute independent or joint conceptual contributions to the inventions claimed by the '159 Patent, and as such, they should be removed for misjoinder pursuant to 35 U.S.C. § 256.

## COUNT IV

### (Correction of Inventorship on U.S. Patent 9,987,261 Pursuant to 35 U.S.C. § 256 As To All Defendants)

173. The allegations of paragraphs 1 through 172 of this Complaint are repeated, realleged and incorporated herein as if fully set forth in this Count.

174. Dr. Chen made joint and independent conceptual contributions to the inventions claimed in claims 1-21 of the '261 patent.

175. Through omission, inadvertence, and/or error, Dr. Chen was not listed on the '261 Patent as an inventor of the inventions claimed in the '261 Patent.

176. The omission of Dr. Chen as an inventor on the '261 Patent occurred without any deceptive intent on Dr. Chen's part.

177. Dr. Jung and Dr. Sawyers did not contribute to the conception of the inventions claimed by the '261 Patent. They should not have been named as inventors and should be removed for misjoinder pursuant to 35 U.S.C. § 256.

178. Furthermore, Mr. Tran and Mr. Wongvipat were unaware of A51/A52 until more than a year after it was first conceived and nine months after A51 was tested by Dr. Chen. Their work did not constitute independent or joint conceptual

contributions to the inventions claimed by the '261 Patent, and as such, they should be removed for misjoinder pursuant to 35 U.S.C. § 256.

## **PRAYER FOR RELIEF**

WHEREFORE, as to Count I of this Complaint, Dr. Chen respectfully requests that the Court issue an order (i) directing the Director for Patents of the United States Patent and Trademark Office to correct U.S. Patent No. 8,445,507 by adding Dr. Chen as a joint inventor thereon, (ii) directing the Director for Patents of the United States Patent and Trademark Office to correct U.S. Patent No. 8,445,507 by deleting Dr. Jung, Dr. Sawyers, Mr. Tran, and/or Mr. Wongvipat as an inventor, and (iii) for such other relief as the Court deems just and proper.

WHEREFORE, as to Count II of this Complaint, Dr. Chen respectfully requests that the Court issue an order (i) directing the Director for Patents of the United States Patent and Trademark Office to correct U.S. Patent No. 8,802,689 by adding Dr. Chen as a joint inventor thereon, (ii) directing the Director for Patents of the United States Patent and Trademark Office to correct U.S. Patent No. 8,802,689 by deleting Dr. Jung, Dr. Sawyers, Mr. Tran, and/or Mr. Wongvipat as inventors, and (iii) for such other relief as the Court deems just and proper.

WHEREFORE, as to Count III of this Complaint, Dr. Chen respectfully requests that the Court issue an order (i) directing the Director for Patents of the United States Patent and Trademark Office to correct U.S. Patent No. 9,388,159 by adding Dr. Chen as a joint inventor thereon, (ii) directing the Director for Patents of the United States Patent and Trademark Office to correct U.S. Patent No. 9,388,159 by deleting Dr. Jung, Dr. Sawyers, Mr. Tran, and/or Mr. Wongvipat as inventors, and (iii) for such other relief as the Court deems just and proper.

WHEREFORE, as to Count IV of this Complaint, Dr. Chen respectfully requests that the Court issue an order (i) directing the Director for Patents of the

United States Patent and Trademark Office to correct U.S. Patent No. 9,987,261 by adding Dr. Chen as a joint inventor thereon, (ii) directing the Director for Patents of the United States Patent and Trademark Office to correct U.S. Patent No. 9,987,261 by deleting Dr. Jung, Dr. Sawyers, Mr. Tran, and/or Mr. Wongvipat as inventors, and (iii) for such other relief as the Court deems just and proper.

WHEREFORE, declare this to be an exceptional case under 35 U.S.C. § 285 and award Dr. Chen costs, expenses, and disbursements in this action, including reasonable attorneys' fees.

Dated: May 17, 2019                          Respectfully submitted,


                                             SCHEPER KIM & HARRIS LLP
                                             Gregory A. Ellis
                                             Michael L. Lavetter

                                             AMIN TALATI UPADHYE, LLP
                                             Shashank Upadhye
                                             Joseph E. Cwik
                                             Samuel J. Ruggio
                                             Yixin H. Tang


                                       By: _____/s/_____
                                             Gregory A. Ellis
                                             *Attorneys for Plaintiff*
                                             *Dr. Degui Chen*